**Gustavo A. SABALLO–CORTEZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 83–7897.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1984.

Decided Dec. 21, 1984.

As Amended May 28, 1985.

Pregerson, Circuit Judge, filed a dissenting opinion.

F.2d 1347 (1984).

Elisec Z. Sisneros, California Rural Legal Assistance Foundation, Berkeley Law Foundation, Paula D. Pearlman, Imperial

Valley Immigration Project, Centro Asuntos Migratorios, El Centro, Cal., for petitioner.

Marshall Golding, Dept. of Justice, Washington, D.C., for respondent.

Before WALLACE, PREGERSON, and ALARCON, Circuit Judges.

### AMENDED OPINION

ALARCON, Circuit Judge:

Gustavo A. Saballo-Cortez (Saballo-Cortez) appeals from the order of the Board of Immigration Appeals (BIA) denying his application for withholding of deportation under 8 U.S.C. § 1253(h) and for asylum under 8 U.S.C. § 1158(a).[1]

### I

#### Issues On Appeal

Saballo-Cortez raises the following issues in his brief filed with this court.

One. The immigration judge and the BIA should have applied the burden of proof set forth in *Stevic v. Sava,* 678 F.2d 401 (2d Cir.1982), *rev'd, INS v. Stevic,* ── U.S. ──, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

Two. The denial of his application was not supported by substantial evidence.

Three. The immigration judge violated his right to counsel, due process and equal protection by failing to inform counsel that he had taken possession of a copy of an arrest warrant and had requested a police and security check from the American Embassy in Managua.

### II

#### Discussion

**A. *Burden of Proof***

■ Saballo-Cortez argued in his brief that the immigration judge and the BIA should have applied the standard of proof adopted in *Stevic v. Sava,* 678 F.2d 401 (2d Cir.1982), *rev'd, INS v. Stevic,* ── U.S. ──, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), in reviewing his "subjective evidence" of a well-founded fear of persecution. In *Stevic,* the petitioner filed a motion to reopen his deportation proceedings based on a claim of persecution under section 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h). The BIA denied the motion on the ground that Stevic had failed to present a claim containing a prima facie showing of "a clear probability of persecution directed at the individual respondent." *Stevic v. Sava,* 678 F.2d at 403–04. The court of appeals in *Stevic* reversed the BIA's denial of the motion holding that it was based on a legal test which was no longer the law. *Id.* at 409.

After the briefs were filed in the present matter, the Supreme Court issued its opinion reversing the Second Circuit's decision in *Stevic v. Sava. INS v. Stevic,* ── U.S. ──, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). The Court held that "an alien must establish a clear probability of persecution to avoid deportation under § 243(h)" 104 S.Ct. at 2492. The Court concluded that the clear probability standard "requires that an application be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." 104 S.Ct. at 2501. Thus, Saballo-Cortez's contention that the immigration judge and the BIA were required to follow *Stevic v. Sava* is no longer tenable with respect to his application for withholding of deportation in light of the Supreme Court's express holding in *INS v. Stevic.* To the extent that the clear probability of persecution test was applied in this matter to the application for withholding of deportation, no error occurred.

**B. *The Standard of Proof For Asylum Claims***

■ The Supreme Court declined to decide the meaning of the phrase "well-found-

---

1. Pursuant to 8 C.F.R. § 208.3(b), the immigration judge considered Saballo-Cortez's asylum request as a request for withholding of deportation under 8 U.S.C.A. § 1253(h).

ed fear of persecution" which is made applicable by the terms of the Immigration and Nationality Act and regulations to requests for discretionary asylum since that issue was not presented in *INS v. Stevic,* 104 S.Ct. at 2501. Because the instant case turns on whether Saballo-Cortez met his burden of persuading the immigration judge and the BIA that his testimony was credible, we need not determine the proper standard of proof necessary to make a prima facie showing of a well-founded fear of persecution under Saballo-Cortez's claim for asylum. We note that the BIA found that Saballo-Cortez failed to meet his burden of proof "whether his claim is assessed in terms of whether he has demonstrated 'clear probability,' 'good reason,' or 'realistic likelihood' of persecution." Thus, we cannot say on this record that the BIA improperly applied the clear probability of persecution standard, as claimed by Saballo-Cortez.

## C. *Did Saballo-Cortez Meet His Burden of Persuasion?*

■ A petitioner seeking withholding of deportation and asylum must first present sufficient facts to establish a prima facie case that there is a clear probability of persecution as to his 1253(h) claim and a well-founded fear of persecution under the discretionary 1158(a) claim. Secondly, he must persuade the immigration judge and the BIA that his evidence is credible.

■ The immigration judge and the BIA were not persuaded that Saballo-Cortez was a credible witness. We must decide if that finding was substantially supported by the evidence in the record. *McMullen v. INS,* 658 F.2d 1312, 1316–1317 (9th Cir. 1981). If the record supports the BIA's finding that the testimony was not credible, then Saballo-Cortez has failed to present substantial evidence to compel a mandatory withholding of deportation. Where the facts presented are not credible, it is also

not an abuse of discretion for the BIA to deny asylum.[2]

## D. *Pertinent Facts*

■ The immigration judge and the BIA made their determination that Saballo-Cortez's testimony was not truthful based on a review of the facts set forth in his application and his testimony.

### 1. The Application.

In a sworn application, signed under penalty of perjury, Saballo-Cortez recited the following facts:

1. He was a 25 year old native and citizen of Nicaragua.

2. He was employed at the Embotelladora Melca, Nicaragua until December, 1982.

3. He arrived in San Ysidro, California, on December 2, 1982.

4. He was issued a passport in Nicaragua in October, 1982.

5. He was issued a Tourist Visa from Mexico in November, 1982.

6. He did not apply for a United States Tourist Visa because he did not believe he was eligible to apply.

7. Because of the "Sandinista Rule" in Nicaragua, he would be "highly susceptible to persecution and/or execution."

8. By departing from Nicaragua, he has expressed a political view adverse to the Sandinista Rule by refusing to live under their government's control, thus "rendering me [subject] to persecution and/or execution."

9. The fact that he has sought asylum would make him "a prime target for persecution" because he presents a great threat to their political control in Nicaragua.

10. Neither he nor any member of his immediate family has been "mistreated" by the authorities in Nicaragua because of race, religion, nationality, political opinion, or membership in a particular social group.

---

**2.** Under 8 U.S.C. § 1158(a), an "alien may be granted asylum in the *discretion* of the attorney general if the attorney general determines that

such alien is a refugee within the meaning of Section 1101(a)(42)(A) of this title." (Emphasis added).

11. He traveled through Honduras, El Savador, Guatemala, and Mexico after leaving Nicaragua, but "had no meaningful stay in any country."

12. He was deprived of his right to buy food by the Comite Defensa Sandinista because he refused to serve as a guard in Managua, Nicaragua.

When shown his sworn application at the hearing during cross-examination, Saballo-Cortez replied that he could not read English. The application is in English.

When asked if the application was accurate in stating that he passed through Honduras, El Savador, and Guatemala, Saballo-Cortez replied that there were mistakes in the answers set forth therein.

2. Saballo-Cortez's Testimony

On direct examination, Saballo-Cortez testified as follows. He does not wish to return to Nicaragua because "over there I feel I am persecuted by the Sandinista army." They have threatened him "many times." "They have taken my rights away from me to work in my country" because he did not want to serve in the military.

When asked to describe the threats, Saballo-Cortez replied that he was threatened "about two times." In January, 1982 he was threatened by a man whose name he did not know, but his nickname is "Caypal." He claimed that Caypal "took over the security of the state." Caypal told him that he would be found dead in a field with his eyes "full of ants" because of his refusal to serve in the military or join the neighborhood of Sandinistas.

In October of 1982, he was threatened again by the same man with "the same threat" because of his failure to serve in the military.

He was also recruited to join the military by other men who would come in the day or at midnight to get him to sign some papers. The men came to his house five times. As a result, Saballo-Cortez went to sleep somewhere else. He could only identify one of the recruiters as "Carlos". Military service is compulsory in Nicaragua.

He testified that he was recruited to join the Comite for the defense of Sandinistas (CDS) because he worked for Coca-Cola in the "department of propaganda." Because of his refusal to serve in the CDS, he did not receive a food card which would have entitled him to pay less for his food. He was also denied a "permit of my license for my work." The refusal denied him the right to work in his country.

He was also "denounced" for "contraband of arms" in the middle of 1981 and detained for three hours.

On cross-examination, Saballo-Cortez testified that he was issued a passport by the present Sandinista government on September 30, 1982. He experienced no problem in obtaining a passport. It took only one week to process his passport application. He also received an exit visa on September 30, 1982, through a travel agent without experiencing any trouble. He received a second exit visa on November 17, 1982.

3. Inconsistencies In The Record

A comparison of the sworn facts in the application for asylum with Saballo-Cortez's testimony, reveals the following inconsistencies:

1. While he testified that he was not permitted to work because he refused to serve in the military or the CDS, his application shows that his employment at a bottling company continued until December, 1982, when he left Nicaragua.

2. His application states he was deprived of the right to buy food by the CDS, but his testimony reveals that he could purchase food although he had to pay a higher price than CDS members.

3. His application states that by departing from Nicaragua, he was expressing a political view against living in his country with the Sandinista's which would subject him to persecution or execution, and yet his testimony, after being shown his passport, revealed that the present government gave him his passport and exit visa, without trouble, with full knowledge of his intention to leave.

The immigration judge pointed to other portions of the testimony which cast doubt

on Saballo-Cortez's veracity. He noted, for example, while Saballo-Cortez claimed that he faced persecution for his failure to serve in the military of his country, he was not arrested for this conduct, and was allowed to travel outside his country on a Nicaraguan passport.

The immigration judge was not persuaded that Saballo-Cortez had been threatened to join the military, and noted that this testimony was not corroborated. *See Sanchez v. INS*, 707 F.2d 1523, 1527 (D.C. Cir.1983) [petitioner failed to provide any other evidence to support his own conclusory statements that he would be persecuted upon his return to El Salvador].

The immigration judge correctly found that there was no evidence in the record that Saballo-Cortez belonged to any political organization or had taken any political position.[3] Thus, he failed to meet his burden of satisfying the immigration judge that it was more probable than not that he had suffered past persecution or feared persecution because of his political opinions.

The immigration judge found that while there was evidence that Saballo-Cortez had been suspected of gun-running, the incident occurred in 1981 and no guns were found. We note also that no further action appears to have been taken by Nicaraguan authorities with respect to this alleged offense, and that Saballo-Cortez was allowed to leave the country on a government passport. *See Fleurinor v. INS*, 585 F.2d 129, 134 (5th Cir.1978) [petitioner was issued passport by Haitian government; court found it difficult to believe that Haiti would allow him to leave if it feared his loyalty, as asserted by petitioner]. We agree with the immigration judge that this incident does not support a finding of present danger to Saballo-Cortez.

We are satisfied from our independent review of the entire record that there are substantial inconsistencies in the application and testimony of Saballo-Cortez to sustain the finding of the immigration judge and the BIA that he was not a truthful witness.

In spite of Saballo-Cortez's stubborn defiance and repeated resistance to participation in his country's compulsory service requirements, he was permitted to work until the day he left without arrest or harm. He was also granted a passport and exit visa. These facts cast great doubt on Saballo-Cortez's claim that he fears persecution. The fact that he was denied such perquisites as discounts on food and a special work permit for some other type of employment does not establish persecution. *See Raass v. INS*, 692 F.2d 596 (9th Cir. 1982) [asylum relief in U.S. depends on something more than generalized economic disadvantage at the destination]. As noted by the BIA, these sanctions, i.e. denial of

---

**3.** Saballo-Cortez claims for the first time on appeal to "belong to the social class of young men who refuse to give service, military or otherwise to the Nicaraguan Comite de Sandinistas of Nicaragua Military." Saballo-Cortez failed to present any evidence to support this contention below. Therefore we do not reach this claim.

We note, however, that in *Chavez v. INS*, 723 F.2d 1431 (9th Cir.1984), this court, in rejecting petitioner's claim for asylum and withholding of deportation, held in part that the petitioner's status as a "young urban male neither in the military nor with the guerrillas" lacked sufficient specificity to trigger political asylum, 723 F.2d at 1433.

The facts in the matter *sub judice* are clearly distinguishable from those before this court in *Bolanos-Hernandez v. INS*, 749 F.2d 1316 (9th Cir.1984). In *Bolanos*, the evidence showed that the alien was threatened with death if he did not join the guerrilla forces or leave the country. *Id.* at 1318. We also noted in *Bolanos-Hernandez* that the alien had "not simply failed to join either political side, he has made a deliberate and considered decision not to do so." *Id.,* n. 18 at 1326. Finally, in *Bolanos-Hernandez,* we pointed out that "[n]either the Immigration Judge nor the Board of Immigration Appeals questioned Bolanos' credibility, or expressed any doubt about whether this threat had actually been made." *Id.* at 1323. In the matter before us, the Immigration Judge and the Board of Immigration Appeals did not believe Saballo-Cortez's testimony. *See Espinoza-Martinez v. INS*, 754 F.2d 1536, 1540 n. 1 (9th Cir.1985) (The rule expressed in *Bolanos-Hernandez* applies when no question has been raised concerning the petitioner's credibility, and no doubt is expressed by the Immigration Judge and the BIA that a direct threat was actually made.).

special privileges to purchase food or obtain more desirable employment may well be legitimate under Nicaraguan law. Saballo-Cortez's claim of grotesque threats against his life do not appear credible in light of the evidence that he remained free from arrest, fully employed, and received full governmental cooperation when he applied for permission to travel. The immigration judge and the BIA were free to infer that if he was subject to official persecution or death because of his draft resistance, he would not have been given a passport.

### E. Applicability Of the McMullen Rule

Saballo-Cortez argues that in *McMullen v. INS*, 658 F.2d 1312 (9th Cir.1981), this court "strongly suggested that the absence of evidence contradicting an alien's assertions regarding asylum should lead to a granting of asylum." In support of this novel proposition, Saballo-Cortez relies on the following passage from *McMullen*: "The INS did not submit evidence of its own which indicated that any of McMullen's exhibits were inaccurate, nor did it submit independent evidence showing McMullen's lack of credibility." *Id.* at 1317. The quoted observation by this court directly follows a recitation of the BIA's finding that McMullen's testimony was not credible and that his reports of terrorism

were not relevant because they were not directed at the petitioner.

■ We do not read *McMullen* as compelling the granting of asylum whenever the petitioner's testimony is not contradicted by evidence presented by the INS. We noted in *McMullen* that "the burden of proof was on McMullen to prove a likelihood of persecution." *Id.* at 1317. Before this court, McMullen conceded "that the burden is on the alien to prove likelihood of persecution and [submitted] that he met this burden." *Id.* at 1317. After reviewing the entire record in that case, we agreed with McMullen. A comparison of the facts of this case with the record in *McMullen* demonstrates that our decision in that case has no application to the matter *sub judice*.[4]

In *McMullen*, the petitioner presented overwhelming and uncontradicted evidence which was fully corroborated that he faced likelihood of persecution in Ireland from the British because he deserted the army to join the Provisional Irish Republican Army, (PIRA) and from the PIRA because his resignation from that group due to its extremist activities. Thereafter, he was imprisoned by the Republic of Ireland for three years for his PIRA activities. Upon his release, he was asked to help the PIRA and refused. After repeated PIRA intimi-

---

4. The dissent argues that the substantial evidence standard of review requires reversal in this case because the INS failed to prove the alien's testimony was internally inconsistent or lacking in the ring of truth, even though the alien's evidence consisted solely of his uncorroborated testimony. Otherwise, the dissent argues, the asylum and withholding of deportation provisions are "hollow gestures."

This misconceives the deference due under the substantial evidence test, *see McMullen*, 658 F.2d at 1317, and would effectively shift the burden of proof from the alien to the INS. Even under the de novo standard of review, which accords no deference to previous administrative determinations, an appellate court could uphold an adverse determination if, after an independent examination of the record, it agreed that the alien failed to meet his burden because his testimony was not credible, regardless of what the INS proved. The dissent's formulation of the substantial evidence standard, rather than conceiving it to be more deferential

than de novo review, would create a presumption of reversal unless the INS comes forth with substantial evidence to disprove an alien's uncorroborated testimony. The proper formulation allows us to reverse only if the trier of fact's conclusion that the alien failed to prove a clear probability of persecution lacks substantial reasonableness. We have reversed on this basis where an alien's testimony was objectively corroborated and the immigration judge initially ruled in the alien's favor. *See id.* But here the testimony was uncorroborated and both the immigration judge and the BIA ruled against the alien. Based on our review of the evidence, we cannot agree that their determinations lacked substantial reasonableness.

We are not unmindful of an alien's limits in obtaining evidence to corroborate his bare testimony concerning the persecution risks in his home country. But Congress allocated the burden of proving a clear probability of persecution to the alien, and we cannot reallocate that burden under the guise of review.

dation, including being kidnapped, he agreed to help. When he refused to kidnap and execute an American, he was brought before a PIRA court of inquiry because of his conduct. When told by a friend that he would be murdered for his disobedience, McMullen fled to the United States, *"using an assumed name to obtain a visa."* (emphasis added) *id.* at 1314. When he arrived in the United States he contacted the Bureau of Alcohol, Tobacco & Firearms, hoping to obtain asylum for sharing his knowledge of PIRA activities. *Id.*

The immigration judge believed McMullen's testimony, after observing his demeanor as a witness, *id.* at 1318, and concluded that deportation should be withheld. *Id.* at 1313. The BIA reversed, finding that McMullen had not shown a sufficient likelihood that he would suffer persecution upon deportation to Ireland, *id.* at 1313–14, because his testimony was "inherently unbelievable." *Id.* at 1317–18.

In reversing the BIA, we noted that the INS did *not* argue that McMullen's testimony was inherently unbelievable "because it is internally inconsistent or lacking in the ring of truth." *Id.* at 1318. Instead, the INS contended that "a petitioner in a deportation is motivated to lie in support of his own case." *Id.* at 1318.

We held in *McMullen* that:

Given … *the immigration judge's finding of credibility,* and the absence of any significant contradictory evidence, we are convinced that McMullen has met his burden of showing that the PIRA considers him a traitor, and that any finding to the contrary would be unsupported.

*Id.* at 1318. (Emphasis added).

In the matter before us, the immigration judge found that Saballo-Cortez was not a credible witness because his testimony and the statements in his application for asylum were internally inconsistent and lacked the ring of truth. After reviewing the record, the BIA also discredited Saballo-Cortez's testimony for the same reasons. As we noted in *McMullen,* in applying the substantial evidence test, we do not review the facts de novo. "The principle of deference to agency expertise is still applicable, and our inquiry is limited to a review of the record to determine whether the agency's determination is substantially supported." *Id.* at 1317.

 In reviewing the record, we must defer to an immigration judge's express and implied findings that the alien's testimony is not credible if the record supports such findings. *See Pereira-Diaz v. INS,* 551 F.2d 1149, 1154 (9th Cir.1977). The findings of the immigration judge and the BIA that Saballo-Cortez's uncorroborated beliefs were unbelievable is fully supported by the record. Thus, substantial evidence supports the BIA's decision under 1253(h) and there was no abuse of discretion under 1158(a).

### F. *Alleged Violation of Saballo-Cortez's Constitutional Rights*

 At the hearing, the immigration judge introduced a copy of a letter from the American Embassy in Managua, Nicaragua, written in response to the court's ex parte inquiry concerning Saballo-Cortez's arrest.

Saballo-Cortez argues for the first time before this court that this conduct was violative of his constitutional rights. Counsel for Saballo-Cortez made no objection before the immigration judge concerning the immigration judge's questionable conduct. Commendably, Government counsel did object to the fact that the court conducted an ex parte investigation without notifying both counsel. Counsel for Saballo-Cortez made no comment concerning this matter. Based on the record before us, the conduct of the immigration judge, while inappropriate for the reasons expressed by the Government, was not prejudicial to Saballo-Cortez. The immigration judge apparently unsuccessfully attempted to develop facts which would shed light on the present status of the arrest warrant for gun smuggling.

### G. Conclusion

We affirm the BIA's denial of Saballo-Cortez's claims for the reason that he failed to meet his burden of persuasion concerning his claims of persecution and his present fears.

At oral argument, counsel for Saballo-Cortez indicated that the conduct of the immigration judge in soliciting unclassified information from the American Embassy concerning Saballo-Cortez may have created a danger for him should he now return to Nicaragua.

 We cannot consider the legal effect of facts not raised below. *Tejeda-Mata v. INS*, 626 F.2d 721, 726 (9th Cir.1980), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982). Our affirmance on this matter is without prejudice to a motion to reopen based on the facts presented to us at oral argument.

AFFIRMED.

PREGERSON, Judge, dissenting:

I cannot say that the decision of the Board of Immigration Appeals (BIA) is supported by substantial evidence; therefore, I dissent.

We have explained that:

Review under the substantial evidence standard is not to be superficial or cursory. Rather, the court's inquiry must be searching and careful, subjecting the agency's decision to close judicial scrutiny. Further, the court is not confined to those portions of the record, if any, which the agency cites in support of its conclusions. The court is charged to review the record as a whole. *Packer Transportation Co. v. United States*, 596 F.2d 891, 894 (9th Cir.1979).

*Memorial, Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir.1980).

The BIA's decision, subjected to close judicial scrutiny, does not satisfy the substantial evidence standard because: (1) it is contradicted by the record, (2) it gives inadequate weight to petitioner's testimony, and (3) it suffers from faulty reasoning.

FACTS

At his deportation hearing, Saballo-Cortez, a native of Nicaragua, conceded deportability under § 241(a)(2) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1251(a)(2) (1982), because he entered the United States illegally. However, he requested political asylum under 8 C.F.R. § 208.9 (1983).[1]

Before the immigration judge, Saballo-Cortez testified that he would be persecuted by the Nicaraguan authorities if he returned to Nicaragua. He asserted that, while in Nicaragua, because of his refusal to join the militia and the Comite de Sandinistas (Sandinista Committee), he was threatened and harassed by high level military personnel and other individuals. He testified that a high level military person known as "Caypal" had repeatedly threatened him. On two occasions, Caypal told Saballo-Cortez that unless he joined the militia or the Sandinista Committee he would be found dead in a field with his eyes filled with ants. Saballo-Cortez also testified that the authorities wanted him to join the Sandinista Committee because he had worked for an American company in its advertising department. Because of this experience, the Sandinistas hoped that he would be a propaganda organizer for the "revolution." In addition to Caypal's threats, Saballo-Cortez explained that he had been harassed by military personnel and others, including an employee of the Police Department and Comite de Sandinistas named "Carlos," who came to Saballo-

1. Applications for asylum submitted during deportation hearings are considered both as asylum applications and applications for "withholding of deportation" under 8 U.S.C. § 1253(h). 8 C.F.R. § 208.3(b) (1983). I disagree with the BIA's refusal to withhold deportation because my review of the record convinces me that its decision is not supported by substantial evidence. I, therefore, need not address the more difficult question whether the BIA's denial of asylum was an abuse of discretion. See *INS v. Stevic*, —— U.S. ——, 104 S.Ct. 2489, 2492–501, 81 L.Ed.2d 321 (1984), for distinction between standards governing INS decisions denying asylum and INS decisions denying withholding of deportation.

Cortez's door day and night, making sleep at home impossible.

Saballo-Cortez further testified that he was unable to obtain a work permit or a food ration card because of his refusal to join the Sandinistas.

The only documentary evidence that Saballo-Cortez submitted was an alleged copy of a Nicaraguan government document accusing him of gun-smuggling against the Sandinista government. He explained that he had been detained for gun-smuggling, but that, in fact, he had not been involved in such activities. He asserted, however, that his life was in danger because the Sandinista government believed that he actually was involved in activities against its interests.

At the hearing, the immigration judge revealed that he had contacted the American embassy in Managua by telegram seeking corroboration for Saballo-Cortez's gun-smuggling arrest. The embassy responded that the police authorities would not release information on arrest records to anyone but the person concerned, i.e., Saballo-Cortez, and that the embassy files had no record of Saballo-Cortez. The immigration judge then *sua sponte* admitted into evidence Saballo-Cortez's purported arrest record for gun-smuggling and the embassy's response to the judge's inquiry. The immigration judge then denied Saballo-Cortez's request for asylum and withholding of deportation.

On appeal, the BIA affirmed the immigration judge's decisions. The BIA based its rulings on Saballo-Cortez's failure to allege that he would be persecuted because of his "political opinion," and on his alleged failure to meet his burden of demonstrating a "well-founded fear of persecution." [2]

Saballo-Cortez then timely petitioned this court.

DISCUSSION

1. *Substantial Evidence*

Amendments to the Immigration and Nationality Act in 1980 removed the granting of "withholding of deportation" from the BIA's discretion. "The Board *must* withhold deportation if certain facts exist" and such decisions are reviewed for substantial evidence. *Chavez v. INS*, 723 F.2d 1431, 1432 (9th Cir.1984); *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981).[3] The BIA's decision relies upon three grounds. First, the BIA found that Saballo-Cortez did not allege that he would be persecuted because of his political opinion. Second, the BIA discounted his testimony because it lacked certain "corroboration." Third, the BIA cited other factors contributing to its decision, including the fact that Saballo-Cortez obtained a Nicaraguan passport and exit visa. Because none of these grounds can withstand close scrutiny, the BIA's decision is unsupported by substantial evidence.

(a) *Political Opinion*

The BIA found that, even assuming that Saballo-Cortez had been threatened, he did not assert that such threats were made because of his "race, religion, nationality, membership in a particular social group, or political opinion" as required by 8 U.S.C. § .1253(h). The majority agrees. However, a perusal of the transcript of the hearing before the immigration judge yields several instances when Saballo-Cortez or his attorney indicated clearly that his refusals to join the militia or the Sandinista Committee were based on his political opinion. For example, his attorney flatly said that Saballo-Cortez was persecuted for his "political opinion." Administrative Record (AR) 64.

**2.** Saballo-Cortez contends that the BIA applied the incorrect burden of proof in dismissing his petition. I agree with the majority that we need not reach the issue of the appropriate burden of proof, but for a different reason. I would not reach that issue because, for the reasons stated in the text, the BIA's opinion lacks substantial evidence under any standard. *See Zavala-Bonilla v. INS*, 730 F.2d 562, 564 n. 2 (9th Cir.1984) (burden of proof issue not considered because

BIA's opinion lacked substantial evidence regardless of the applicable burden of proof).

**3.** The majority misstates the appropriate burden of proof when it suggests, majority opinion at 1262, that Saballo-Cortez must "present substantial evidence to compel a mandatory withholding of deportation."

In addition, other statements by Saballo-Cortez at the hearing indicate that his problems with Nicaraguan authorities stemmed from his refusal, *for political reasons,* to support the Sandinista effort. For example, he explained that he did not want to join the militia "[b]ecause of the system," AR 46, and that he had aroused the Sandinistas' ire because he did not want to work "[f]or the revolution." AR 48. His written application for asylum cites his adverse "political" views as a reason why he would be persecuted. AR 81. His aversion to the established political system is also indicated by his refusal to join the Sandinistas even in the face of their potential denial of a food ration card and work permit as well as in his refusal to produce propaganda for them. *See, e.g.,* AR 51, 54.

This case should be remanded on this basis alone. It is impossible to discern the extent to which the BIA relied upon its erroneous finding that Saballo-Cortez had not alleged persecution based on his political opinion. *See Zavala-Bonilla v. INS,* 730 F.2d 562, 567 (9th Cir.1984); *cf. Santana-Figueroa v. INS,* 644 F.2d 1354, 1356 (9th Cir.1981) (case remanded because "[w]hen important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary.") (footnote omitted).

### (b) *Saballo-Cortez's Testimony*

The BIA's opinion gives insufficient weight to Saballo-Cortez's testimony.

The BIA itself has previously explained that "although the [petitioner] may ultimately have the burden of persuasion, her own testimony may be the best—in fact the only—evidence available to her. It must, therefore, be accorded the most *careful and objective evaluation possible,* in the light of all available pertinent evidence...." *Matter of Sihasale,* 11 I. & N.Dec. 759, 762 (BIA 1966) (emphasis added); *see also Matter of Dunar,* 14 I. & N.Dec. 310, 319 (BIA 1973). We have also directed that a refugee's testimony should be carefully considered because a person seeking asylum is often limited in the evidence he or she can obtain. *Zavala-Bonilla,* 730 F.2d at 567; *McMullen,* 658 F.2d at 1319.

A refugee's testimony may, however, be discredited in the same way as any other witness's testimony—for example, by inconsistent statements or because of the witness's demeanor. At the hearing before the immigration judge, there appeared to be an inconsistency between Saballo-Cortez's testimony and his written asylum application. He testified that he traveled by air, with one stop, to Mexico en route to the United States. In his sworn application, however, he wrote that he had traveled through El Salvador, Guatemala, Honduras, and Mexico. The immigration judge noted this discrepancy in his decision, but did not expressly draw any conclusions from it. The immigration judge made no comments about Saballo-Cortez's credibility or demeanor.[4]

---

**4.** The immigration judge's brief reference to the inconsistency regarding petitioner's travels merely indicates that the original application "was possibly in error." The immigration judge never relied on or even specifically made an adverse credibility determination based on that inconsistency or on anything else. The majority here, however, casts the immigration judge's decision as a credibility determination. The majority then holds that it "must defer to an immigration judge's express and implied" credibility determination, majority opinion at 1266, concluding that "[t]he findings of the immigration judge and the BIA that Saballo-Cortez's uncorroborated beliefs were unbelievable is fully supported by the record." *Id.* Nowhere in the record do I find a ruling by the immigration judge that Saballo-Cortez was not a credible witness. Moreover, the majority opinion might

be misread to place the burden of credibility directly on the asylum applicant. Of course, no such burden exists.

Furthermore, a review of the record demonstrates that the majority finds an inconsistency where in fact there may only have been confusion that may have stemmed from the INS attorney's overbearing treatment of petitioner. AR 34, 56, 64–67, 73. *See, e.g., Zavala-Bonilla,* 730 F.2d at 566 (where BIA adverse credibility findings were the product of petitioner's confusion due to lack of English speaking skills).

Finally, the "inconsistency" between petitioner's statement that he had traveled through several Central American countries en route to Mexico and his statement at the hearing that he traveled by air—with one stop—to Mexico, might have been easily explained. Saballo-Cor-

Moreover, there is no indication in the BIA's opinion that Saballo-Cortez gave false testimony. What the BIA did, however, was to consider only Saballo-Cortez's documentary evidence as "evidence" (alleged gun-smuggling incident) and to discount his oral testimony by suggesting that further corroboration is necessary. But this treatment is contrary to our decisions acknowledging the special difficulties encountered by refugees in obtaining corroboration. *See Zavala-Bonilla,* 730 F.2d at 567 (citing *McMullen* and a United Nations Handbook); *cf. Reyes v. INS,* 673 F.2d 1087, 1089–90 (9th Cir.1982) (corroborating evidence not required in motion to reopen; Board abused its discretion when it discounted petitioner's affidavits without valid reason).

In any event, the BIA's assertions regarding the corroboration that Saballo-Cortez should have supplied do not undermine his testimony. For example, Saballo-Cortez testified that he was threatened with death in a field with his eyes filled with ants. In discounting that testimony the BIA asserted that the position and authority of the man who had made the threat was not made clear and that "[t]here is no evidence that the respondent will be killed by the unnamed security officer." BIA Opinion at 3. But the record shows that Saballo-Cortez did in fact name the security officer, Caypal. Second, the BIA does not explain why Saballo-Cortez should have known the exact rank of the man who threatened him. Finally, it asks too much to require Saballo-Cortez to present evidence to "prove" that Caypal would indeed have killed him. Such unobtainable evidence is not required to prove a clear probability of persecution. *See Zavala-Bonilla,* 730 F.2d at 565; *cf. Matter of Dunar,* 14 I. & N.Dec. at 319. To require such

evidence would make the asylum offers embodied in § 1158(a) and § 1253(h) hollow gestures.

To take another example, the BIA discounts Saballo-Cortez's testimony of threats made against him by Sandinista officials by explaining:

He [Saballo-Cortez] admitted that military service was required in Nicaragua. Under the circumstances, the steps taken against him could be interpreted as *legitimate legal sanctions.*

BIA Opinion at 4 (emphasis added). This finding is unsupportable. Even if one characterizes Saballo-Cortez as a Nicaraguan army evader, it is hard to imagine how repeated threats, including a threat of being found dead in a field with one's eyes filled with ants, could ever "be interpreted as legitimate legal sanctions."

The BIA's opinion should thus be reversed for failure to give fair consideration to Saballo-Cortez's direct testimony. *See Zavala-Bonilla,* 730 F.2d at 567; *McMullen,* 658 F.2d at 1317 (In reversing the BIA's denial of asylum, we noted that the "INS did not submit evidence of its own which indicated that any of McMullen's exhibits were inaccurate, nor did it submit independent evidence showing McMullen's lack of credibility.").[5]

### (c) *The BIA's Remaining Evidence*

The BIA's other reasons include: (1) the official Nicaraguan letter submitted by Saballo-Cortez was not accompanied by a certified translation; (2) Saballo-Cortez had not shown that he would have been unable to obtain food or work because of the Sandinista government's refusal to issue him a food ration card or work permit; (3) Saballo-Cortez's detention for gun smuggling was of relatively short duration (3 hours)

tez's counsel repeatedly sought the opportunity to do so, but was rebuffed. AR 68, 71–72.

**5.** Contrary to the majority, I do not think that *McMullen* is significant only where the immigration judge finds that a petitioner is credible and the BIA finds that he is not. Regardless of where the adverse credibility decision arises, to meet the substantial evidence standard, the BIA

must logically explain its reasons for reaching its decision. *Santana-Figueroa,* 644 F.2d at 1356. *See Contreras-Buenfil v. INS,* 712 F.2d 401, 403 (9th Cir.1983) (per curiam) (requiring same even where standard of review is more deferential than substantial evidence); *Prapavat v. INS,* 662 F.2d 561, 562 (9th Cir.1981) (per curiam) (same).

and distant in time (3 years); and (4) Saballo-Cortez was able to obtain a passport and visa to leave Nicaragua. Contrary to the majority's assertion, these reasons should not support the BIA's denial of withholding of deportation.

The lack of a certified translation is of no great moment because the BIA employs many translators who could have easily translated the letter. *See Zavala-Bonilla,* 730 F.2d at 565. Second, it is unreasonable to require Saballo-Cortez to show that the Sandinista's refusal to issue a food ration card or work permit would result in his total inability to find food or work. Such refusal itself clearly indicates that the Sandinista authorities have made reprisals against him. Third, even if the alleged "gun-smuggling" accusation is remote in time, it is supported by documentary evidence.[6] Finally, Saballo-Cortez's ability to obtain a Nicaraguan passport does not constitute substantial evidence, standing alone, to support the BIA's refusal to grant Saballo-Cortez withholding of deportation. The majority relies heavily on Saballo-Cortez's ability to get a passport. This isolated fact is insufficient to support a denial of withholding of deportation. *See Zavala-Bonilla,* 730 F.2d at 565 n. 4 (asylum applicant need not show that government of nation from which applicant seeks asylum remembers him/her). To say that the authorities let Saballo-Cortez leave is a far cry from concluding that they would welcome his return.[7]

2. *The Immigration Judge's Ex Parte Inquiry*

In denying Saballo-Cortez's application, the BIA does not rely on the embassy's response to the immigration judge's *ex parte* inquiry. But, at the very least, the immigration judge's inquiry may add to the potential danger Saballo-Cortez might face were he to return to Nicaragua. In sup-

port of this contention, Saballo-Cortez submitted two State Department letters—one to a District Director in Boston concerning a particular Salvadorean asylum applicant (El Salvador letter), and the other to the Commissioner of the INS concerning the general practice of sending unclassified inquiries to U.S. embassies overseas (Commissioner letter). Both letters indicate the State Department's concern over the type of inquiry made by the immigration judge here.

The letters advise against such inquiries because foreign nationals are employed in embassy mailrooms. Hence, any unclassified documents sent to an embassy may come to the attention of the foreign government in which the embassy is located. In the Commissioner's letter, the State Department advised that such requests should be sent through State Department classified channels and expressed concern that "the fact that an individual has applied for asylum may become known to local security agencies, thereby putting the applicant or his family in danger."

The El Salvador letter stated: "These unclassified communications in all probability passed at some stage through the hands of Salvadorean nationals." The letter also expressed concern that "there may be a risk that [the asylum applicant] faces some danger in El Salvador if her asylum application has become known to these violent forces...." Then, *despite* some question as to the applicant's credibility, the letter nonetheless added, "we are not able to reassure ourselves that information relating to her asylum request did not fall into the hands of those who might wish to do her harm."

Saballo-Cortez's case may be even more precarious than the case discussed in the El Salvador letter. The embassy's response here is unclear as to whether the Managua

---

**6.** Copies of the letter submitted by Saballo-Cortez and the embassy's response to the immigration judge's inquiry were submitted to us. The immigration judge's inquiry to the American embassy in Managua was not made a part of the record.

**7.** The majority, in footnote 4, misreads the views expressed in this dissent when it concludes that the dissent would shift the burden of proof. No such result is intended. Rather, this dissent is prompted by the failure of the BIA to support its ruling with substantial evidence.

police were specifically asked about Saballo-Cortez. Thus, the immigration judge and embassy's action may have alerted the Nicaraguan authorities to Saballo-Cortez's application for asylum—and would constitute more of a signal than a routine passport application upon which the majority places so much weight.

The government's only response to the potential danger to Saballo-Cortez from the embassy letter is that he failed to object at the hearing to the introduction of the letter in evidence. Given the surprising and unusual nature of the immigration judge's action as well as the INS attorney's objection to the letter, as a matter of fairness I believe we should address Saballo-Cortez's contentions concerning the immigration judge's inquiry. Absent a direct remand, I agree with the majority that Saballo-Cortez must be allowed to petition for reopening of his case to consider the additional danger to him that may have stemmed from the immigration judge's unorthodox inquiry.

CONCLUSION

For the reasons stated in the foregoing discussion, I believe that the BIA's decision is not supported by substantial evidence, and I would reverse it.