111 F.3d 720
 47 Fed. R. Evid. Serv. 8, 97 Cal. Daily Op.
Serv. 2815,
97 Daily Journal D.A.R. 4956
Leonel Antonio MEJIA-PAIZ, Petitioner-Appellant,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.
 No. 95-70174.
 United States Court of Appeals,
Ninth Circuit.
 Submitted* June 21, 1996.
Decided April 17, 1997.
 
 Xavier J. Vega, Los Angeles, California, for petitioner-appellant.
 John L. Davis, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent-appellee.
 Petition to Review a Decision of the Immigration and Naturalization Service. I&NS No. Amu-axg-gfk.
 Before: CHOY, SNEED, and FERGUSON, Circuit Judges.
 Opinion by Judge SNEED; Dissent by Judge FERGUSON.
 SNEED, Circuit Judge:
 
 
 1
 Leonel Antonio Mejia-Paiz petitions this court for review of the Immigration and Naturalization Service's (INS) denial of his application for political asylum and withholding of deportation. Because substantial evidence supports the decisions of the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA"), we deny his petition.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Petitioner, a citizen and native of Nicaragua, entered the United States without inspection in April 1985. He was detained shortly thereafter by immigration officials and was ordered by the INS to show cause why he should not be deported. In January 1990, petitioner appeared before the immigration judge, conceded deportability and requested political asylum. He fears upon returning to Nicaragua that he will encounter renewed persecution due to his affiliation with the Jehovah's Witnesses Church. According to petitioner, the Sandinistas believe that the Jehovah's Witnesses Church is linked to the CIA.
 
 
 3
 Petitioner's alleged problems began in 1979 when the Sandinistas gained control of Nicaragua's government. He claims that the Sandinistas caused him to resign from his job, cancelled his food-ration card, forced him to attend and participate in political rallies, threatened him with death, and beat him on at least two occasions. At his deportation hearing, petitioner said that because he was a Jehovah's Witness, the Sandinistas considered him a "contra-revolutionary."
 
 
 4
 In support of his testimony, Petitioner introduced into evidence an affidavit from his brother attesting to petitioner's membership with the Jehovah's Witnesses. He also introduced newspaper articles which discussed, in general terms, the continuing political instability in Nicaragua. The IJ admitted a letter from the U.S. Department of State which stated in part: "the applicant has not established a well-founded fear of persecution upon return to Nicaragua ... Sandinista government-sponsored persecution of religious persons, including Jehovah's Witnesses ... has of course ceased, and we have no reports of mistreatment since the Chamorro government took office."
 
 
 5
 The IJ denied petitioner's request for asylum and withholding of deportation and granted him voluntary departure. The IJ questioned the sincerity of the petitioner's assertion that he was a Jehovah's Witness, and a fortiori rejected his claims of past persecution. Likewise, the IJ determined that petitioner did not have a well-founded fear of persecution upon return to Nicaragua. Assuming, arguendo, that petitioner established past persecution, the IJ considered the Sandinistas' defeat in 1990 to constitute a "change of circumstances" sufficient to defeat petitioner's request.
 
 
 6
 The Board of Immigration Appeals accepted the IJ's findings and dismissed the petitioner's appeal. He then filed this petition for review.
 
 II.
 DISCUSSION
 A. Standard of Review
 
 7
 The denial of asylum is reviewed for abuse of discretion. Kazlauskas v. INS, 46 F.3d 902, 905 (9th Cir.1995). "The factual findings underlying the decision are reviewed for substantial evidence, and the IJ's determination should not be reversed absent compelling evidence of persecution." Id. The Board's findings of fact are conclusive and must be upheld "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). The decision to withhold deportation is also reviewed for substantial evidence. Kazlauskas, 46 F.3d at 907.
 
 B. Substantial Evidence
 
 8
 This case presents a problem inherent in many, if not all, cases where an alien seeks to avoid deportation: the inescapable inability of the INS to demonstrate that the petitioner's recital of past persecution is false. The events are distant and an investigation to determine truth is impracticable. As a consequence, the petitioner bears the burden of persuading the IJ that his evidence is credible, Saballo-Cortez v. INS, 761 F.2d 1259, 1262 (9th Cir.1985), and the IJ is entitled to evaluate assertions of past persecution in light of the strength or weakness of such other evidence as the petitioner may present.[1]
 
 
 9
 Petitioner contends, to the contrary, that the absence of evidence contradicting his assertions should lead to a grant of asylum, noting that "the government did not show any lack of credibility." In support of his argument, petitioner relies on this court's decision in McMullen v. INS, 658 F.2d 1312 (9th Cir.1981). Specifically, petitioner calls to our attention the following passage in McMullen: "The INS did not submit evidence of its own which indicated that any of McMullen's exhibits were inaccurate, nor did it submit independent evidence showing McMullen's lack of credibility." Id. at 1317. However, we have since limited the reach of this statement to the facts presented in McMullen. See Saballo-Cortez, 761 F.2d at 1265 (holding that McMullen does not compel a grant of asylum whenever the petitioner's testimony is not contradicted by evidence presented by the INS).
 
 
 10
 As we have previously made clear, petitioner's position would effectively shift the burden from the alien to the INS. Id. at 1265, n. 4. "This misconceives the deference due under the substantial evidence test," and would create "a presumption of reversal unless the INS comes forth with the substantial evidence to disprove an alien's uncorroborated testimony." Id. Rather, the proper application of the substantial evidence test requires reversal only where the IJ's conclusion lacks substantial reasonableness. See id.
 
 
 11
 C. Application of the Substantial Evidence Standard
 
 
 12
 Here petitioner failed to persuade the IJ that he was a credible witness. After considering all the evidence, the IJ stated: "The court questions the sincerity of the respondent's claim to religion and membership in the Jehovah's Witness." Because petitioner's status as a Jehovah's Witness was integral to his claims of past persecution, the IJ concluded that petitioner had failed to meet his burden of establishing a ground on which asylum could be granted. We must determine whether the IJ's finding was "substantially supported by the evidence in the record." Saballo-Cortez, 761 F.2d at 1262; Vilorio-Lopez v. INS, 852 F.2d 1137, 1141 (9th Cir.1988) ("This court reviews credibility findings for substantial evidence.").
 
 1. Well-Founded Fear of Persecution
 
 13
 To be eligible for asylum, an applicant must establish "either past persecution or a well-founded fear of present persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Berroteran-Melendez v. INS, 955 F.2d 1251, 1255 (9th Cir.1992); 8 U.S.C. § 101(a)(42). The burden is on the applicant to establish eligibility. Acewicz v. INS, 984 F.2d 1056, 1061 (9th Cir.1993).
 
 
 14
 To establish a well-founded fear of persecution, an applicant for asylum must demonstrate both a subjective and an objective fear of persecution. Acewicz, 984 F.2d at 1061. The applicant must show both a "genuine" subjective fear and a "reasonable possibility" of persecution. Berroteran-Melendez, 955 F.2d at 1256. "An applicant's candid, credible and sincere testimony demonstrating a genuine fear of persecution satisfies the subjective component of the well-founded fear standard." Id. (internal quotations omitted). "The objective component requires a showing by 'credible, direct, and specific evidence' of facts supporting a reasonable fear of persecution." Acewicz, 984 F.2d at 1061 (quoting Rodriguez-Rivera v. U.S. Dept. of Imm. and Nat., 848 F.2d 998, 1002 (9th Cir.1988) (per curiam)).
 
 
 15
 To repeat, petitioner's application focuses primarily on his affiliation with the Jehovah's Witnesses, a religion targeted by the Sandinistas for being counterrevolutionary. Petitioner also attributes his problems with the Sandinistas to his relationship with his brother, Mauricio Mejia-Paiz, an outspoken opponent of the Sandinista government.
 
 
 16
 Petitioner asserts that he lost his job at a bank on account of his religious beliefs, and because he resisted pressure to join a Sandinista-supported employee's union. Petitioner also alleges that he was physically abused by the Sandinistas. Once, when he tried to secure his brother's release from prison in 1984, he was insulted, beaten, and threatened with death. And again, following a "Contra"-military offensive in 1985, he and other persons from his neighborhood were taken from their homes to a public plaza, forced to participate in a pro-Sandinista rally, and physically beaten when they refused. Petitioner decided to leave Nicaragua in 1985.
 
 2. The IJ's Credibility Finding
 
 17
 First, the IJ found that petitioner could have offered proof that he was a member of the Jehovah's Witnesses but did not. The IJ reasoned that establishing membership through either a local or foreign church would have been a relatively uncomplicated task. We agree. In fact, the petitioner himself claimed in his application for asylum that many of his problems were due to the fact that there was proof of his membership "in the files of the Jehovah's Witnesses Church," presumably in Nicaragua. Petitioner cannot have it both ways. Proving one's membership in a church does not pose the type of particularized evidentiary burden that would excuse corroboration. Cf. Gomez-Saballos, 79 F.3d at 916.
 
 
 18
 The IJ also gave little weight to the affidavit of petitioner's brother because it failed to provide any basis for his knowledge that petitioner was indeed a Jehovah's Witness. The IJ's skepticism was reasonable under the circumstances. The affidavit contained no more than a lone assertion unsupported by explanation or corroborative facts.[2] The IJ found that petitioner's entire family, including his brother, was Roman Catholic. This finding weakened petitioner's credibility as to his religious affiliation.
 
 
 19
 Finally, the IJ also found that petitioner's willingness to swear under oath undermined his claim that he was a Jehovah's Witness. Based on his past experience with Jehovah's Witnesses, the IJ took judicial notice that Jehovah's Witnesses were prohibited from swearing under oath. The IJ noted that "many other Jehovah's Witnesses who have appeared before this court have declined and indicated that it is ... prohibited by their religion to swear under God or swear under oath but would only affirm." The petitioner swore under oath on two occasions. We recognize that even a Jehovah's Witness might have sworn under oath in the circumstances in which the petitioner found himself. Although we would consider this inconsistency, amongst a body of credible and persuasive evidence to the contrary, an inadequate basis for an adverse credibility finding, see Martinez-Sanchez v. INS, 794 F.2d 1396, 1400 (9th Cir.1986), we find no fault in the IJ's mention of it. It is but one of numerous telling details in this case.
 
 
 20
 Other telling details include inconsistencies in petitioner's testimony. For example, petitioner first testified that the Sandinistas forced him to resign from his job in 1979. However, on cross examination, he admitted that he maintained his job until September 1983--four years after the Sandinistas took control of the bank. Also, petitioner testified that he was forced to resign, in part, because he resisted pressure to join the UNE, a Sandinista-supported employees' union. However, petitioner later acknowledged that he joined the UNE in 1979 and remained a member, albeit not an enthusiastic one, until he was terminated. These discrepancies are not minor. See Berroteran-Melendez, 955 F.2d at 1256.
 
 
 21
 In addition, petitioner had an astonishingly difficult time recalling when he became a Jehovah's Witness. In spite of the IJ's effort to clarify the issue, all petitioner could say was that it occurred sometime between 1974 and 1976. The dubiety of the IJ was enhanced, quite reasonably, by this inability to recall when he became a Jehovah's Witness despite the fact that he asserts it caused him great suffering. Specifically, petitioner testified that his decision to become and remain a Jehovah's Witness caused him to be fired from his job, physically beaten, threatened with death, and eventually required that he flee his homeland. Nonetheless, petitioner cannot recall whether he became a Jehovah's Witness in 1974, 1975, or 1976.
 
 
 22
 Our independent review of the record satisfies us that, in addition to the reasons expressed by the IJ, there are substantial gaps and inconsistencies in petitioner's testimony. These reinforce the finding that petitioner was not a credible witness, a finding which must be given substantial deference by the reviewing court. Id. at 1256. We do not review the facts de novo; our inquiry is limited to a review of the record to determine whether the agency's determination is substantially supported. Saballo-Cortez, 761 F.2d at 1266.
 
 
 23
 "Because [petitioner] failed to present candid, credible and sincere testimony demonstrating a genuine fear of persecution, he failed to satisfy the subjective component of the well-founded fear standard." Berroteran-Melendez, 955 F.2d at 1257-58. His request for asylum, therefore, fails.
 
 D. Change of Conditions
 
 24
 The IJ also relied on a State Department letter for his alternative holding that, even had petitioner demonstrated past persecution, the subsequent defeat of the Sandinista government in 1990 constituted a "change of conditions" sufficient to rebut petitioner's well-founded fear of persecution. In rebuttal petitioner argues that, under the Chamorro administration, the Sandinistas still control the military and the police, and thus, remain a significant threat to petitioner's safety. Petitioner relies on newspaper articles to establish that he still faces a likelihood of persecution on return to Nicaragua. The articles convey that politically motivated attacks by the Sandinistas have occurred after the election. However, it is not at all clear that these reports advance petitioner's claim. See Sarvia-Quintanilla v. INS, 767 F.2d 1387, 1394 (9th Cir.1985) (requiring sufficiently specific evidence indicating that the alien's predicament is appreciably different from the dangers faced by all his countrymen). They fail to mention incidents of religious persecution. Conversely, the State Department letter states that persecution of Jehovah's Witnesses has ceased, and concludes, based on the "specific information" in petitioner's request for asylum, that he has failed to establish a well-founded fear of persecution. Although it appears that the IJ's reliance on the State Department letter was appropriate, see Osorio v. INS, 99 F.3d 928, 933 (9th Cir.1996) (requiring an individualized assessment of the effect of changed country conditions), we need not rely on the changed country conditions because the petitioner has failed to provide credible support for his assertion that he is likely to be persecuted under either the old or new government. See Berroteran-Melendez, 955 F.2d at 1257.
 
 E. Withholding of Deportation
 
 25
 Because the standard for withholding of deportation is higher than the standard for asylum, and because petitioner failed to meet the lower standard for a grant of asylum, the BIA's denial of withholding of deportation is supported by substantial evidence. See Acewicz, 984 F.2d at 1062.
 
 III.
 CONCLUSION
 
 26
 Substantial evidence supports the conclusion that petitioner failed to present credible evidence supporting his assertions of past persecution. Consequently, his fear of persecution upon return to Nicaragua is not well-founded.
 
 
 27
 PETITION DENIED.
 
 FERGUSON, Circuit Judge, dissenting:
 
 28
 Today the majority of this panel approves the right of the government to decide the question of who is a Jehovah's Witness. The First Amendment rejects the right of the government to decide that religious question. "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Watson v. Jones, 80 U.S. (13 Wall.) 679, 728, 20 L.Ed. 666 (1871). However, in this case, the majority departs from this long-standing constitutional doctrine, doing violence to the separation of church and state.
 
 Background
 
 29
 Mejia-Paiz, a citizen of Nicaragua, entered the United States without inspection on April 1, 1985. In his deportation hearing he testified that he should not be returned to Nicaragua because he had been targeted by the Sandinistas for his religious and political beliefs and activities and feared renewed persecution if he returned. The immigration judge ("IJ") who heard Mejia-Paiz's case found his testimony not to be true and denied relief. The Board of Immigration Appeals affirmed the IJ's decision "based upon and for the reasons set forth in that decision."
 
 
 30
 Mejia-Paiz claimed that the Sandinistas persecuted him on account of his being a Jehovah's Witness. He claimed the Sandinistas fired him from his job, cancelled his food ration card, and forced him to attend and participate in political rallies. He testified that the Sandinistas "wanted for us to repeat [ ] that there was no God ... and to speak ... in favor of them." He also claimed he was interrogated about his brother's anti-Sandinista activities and beaten and threatened when he tried to secure his brother's release from prison. He testified that he continued to fear persecution, notwithstanding the change in government, because Sandinistas retain some control in the government.
 
 Adverse Credibility Findings
 
 31
 The IJ questioned and doubted the sincerity of Mejia-Paiz's claim to be a Jehovah's Witness and the alleged persecution he therefore was faced with on three grounds: (1) his failure to present evidence from a local or Nicaraguan church of his affiliation with Jehovah's Witnesses; (2) Mejia-Paiz's brother's failure to state in his affidavit or by oral testimony how he would know his brother is a Jehovah's Witness; and (3) Mejia-Paiz's willingness to swear under oath, rather than affirm, contrary to the IJ's personal belief that Jehovah's Witnesses do not swear under oath. All three of these grounds constitute impermissible bases for the IJ's adverse credibility finding.
 
 
 32
 "Although an immigration judge's credibility findings are granted substantial deference by reviewing courts," Turcios v. INS, 821 F.2d 1396, 1399 (9th Cir.1987), the IJ "must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." Hartooni v. INS, 21 F.3d 336, 342 (9th Cir.1994). "The testimony of the applicant, if credible ... may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (1996); accord Turcios, 821 F.2d at 1402 (detailed testimony of petitioner mitigates the need for corroboration). Minor inconsistencies in the petitioner's testimony "that were possibly the result of mistranslation or miscommunication, and are not material to [the petitioner's] fear for his safety," are not an adequate basis for an adverse credibility finding. Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir.1988) (characterizing inconsistencies such as the year of death squad incident, length of time men were sheltered from death squad, and whether payment was made for accommodation as minor and immaterial to petitioner's fear of safety); see also Martinez-Sanchez v. INS, 794 F.2d 1396, 1400 (9th Cir.1986) (characterizing petitioner's inconsistencies with respect to certain dates and the number of his children as "trivial errors" and insufficient to support an adverse credibility finding).
 
 
 33
 Mejia-Paiz offered credible and unrefuted testimony that he is a Jehovah's Witness. When asked by the INS attorney when he specifically became a Jehovah's Witness, Mejia-Paiz answered he became a Jehovah's Witness when he met one at the bank where he was working. Mejia-Paiz even offered to supply the name of his co-worker. Because his testimony was detailed, credible, and unrefuted, he was not required to submit corroborating evidence from a local church. The requirement of corroboration was thus an illegitimate basis for the IJ's adverse credibility determination. See Hartooni, 21 F.3d at 342.
 
 
 34
 Second, Mejia-Paiz's Roman Catholic brother's failure to explain how he would have any knowledge of Mejia-Paiz's religious membership is not a cogent reason for disbelieving Mejia-Paiz's asserted beliefs and his brother's affidavit. Siblings tend to know each other's beliefs and customs. The fact that the brother is Roman Catholic does not make him less able to know that Mejia-Paiz is a Jehovah's Witness. The brother's failure to specify the source of his knowledge, either in his affidavit or in oral testimony, does not support the IJ's adverse credibility finding. See id.; see also Lopez-Reyes v. INS, 79 F.3d 908, 912 (9th Cir.1996) (rejecting adverse credibility finding where IJ found petitioner's credibility was weakened by his failure to support his testimony with corroborating evidence from his family).
 
 
 35
 Finally, the IJ's personal belief that Jehovah's Witnesses do not swear under oath was an improper reason for doubting Mejia-Paiz's credibility. In addition to the First Amendment concerns I address below, the IJ's reliance on his understanding of the religious practices of Jehovah's Witnesses was insufficient to undermine Mejia-Paiz's credibility even if it did not violate the separation of church and state. The two times that Mejia-Paiz swore under oath were in response to the court's direction that he take the oath. It is not clear whether there is a distinction between swearing and affirming in Spanish, and if so, whether the translator made that distinction clear to Mejia-Paiz. See Vilorio-Lopez, 852 F.2d at 1142. Furthermore, even if Mejia-Paiz's swearing was not the result of mistranslation or miscommunication, his swearing only represents two incidents where he failed to conform precisely with the tenets of his religion and does not necessarily mean he is not a Jehovah's Witness. See id. Mejia-Paiz's swearing under oath, assuming it violated a tenet of his religion, was a minor inconsistency or a trivial error which is immaterial to his fear for his safety. Martinez-Sanchez, 794 F.2d at 1400. As such, it was not a legitimate basis for an adverse credibility finding. See Hartooni, 21 F.3d at 342.
 
 
 36
 Neither the IJ nor the Board expressed any other reason for disbelieving either Mejia-Paiz's claim that he is a Jehovah's Witness or his claim that he was persecuted on account of his religious beliefs. Because the IJ's only articulated reasons for disbelieving Mejia-Paiz rest on impermissible grounds, this court must assume that Mejia-Paiz was otherwise credible. See Damaize-Job v. INS, 787 F.2d 1332, 1338 (9th Cir.1986).
 
 
 37
 Government Determinations of Religious Dogma
 
 
 38
 The most egregious of all the determinations of the IJ is his taking of administrative notice, based on personal belief, that Jehovah's Witnesses are prohibited from swearing under oath. That error constitutes an impermissible governmental inquiry into religious dogma and practice that is so chilling that it overrides all else in this case. The religious intolerance exhibited by the IJ's assumption that Mejia-Paiz was not a true Jehovah's Witness due to his noncompliance with a personally perceived custom of the Jehovah's Witness church destroys the credibility of the entire fact finding process. Such intolerance creates a structural defect in the legal process and is per se prejudicial. See Arizona v. Fulminante, 499 U.S. 279, 293, 111 S.Ct. 1246, 1256, 113 L.Ed.2d 302 (1991) (harmless error analysis is inapplicable to convictions involving race discrimination in grand jury selection or trial by biased judge); Vasquez v. Hillery, 474 U.S. 254, 263, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986) (exclusion of blacks from grand jury pool is not harmless even after a fair trial because "[w]hen constitutional error calls into question the objectivity of those charged with bringing a defendant to justice, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm.").
 
 The IJ explained in his oral decision:
 
 39
 The respondent's membership in the Jehovah's Witness Church requires him to do certain things or to refrain from doing other things. The Court takes judicial notice or official notice, [citation], that Jehovah's Witnesses are prohibited from swearing under oath. The court notes that many other Jehovah's Witnesses who have appeared before this Court have declined and indicated it is against their religion or prohibited by their religion to swear under God or swear under oath but would only "affirm". The respondent, the Court notes swore under oath on two occasions. When he was placed under oath at the hearing before this Court on December 20, 1989, and secondly again when he swore under penalty of perjury to the truthfulness of his application for asylum.
 
 
 40
 The Court questions the sincerity of the respondent's claim to religion and membership in the Jehovah's Witness [sic]. In light of the failure of him to prove membership by other than his self-serving claim. And his swearing under oath when this is against his religion. [sic]
 
 
 41
 Oral Decision of the Immigration Judge, Sept. 7, 1990, at 4-5.
 
 
 42
 Imagine that on Ash Wednesday a Roman Catholic appeared before an Administrative Law Judge without the cross of ashes on his forehead and the judge determined that the lack of ashes made the person a non-Catholic. That would be identical to the IJ's credibility determination in this case. Pointing to a perceived custom of a religion and making a subsequent personal judgment that a person's failure to conform with the custom renders him or her not a member of that religious faith trivializes religion, religious practices and religious organizations. Persons may be excommunicated by the religious authorities of their church, but in the United States such assessments are religious and not ones which the government has the power to make. It is prohibited by the First Amendment. Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (state court violated the First Amendment by deciding whether or not a bishop was properly defrocked by the Church when resolving property dispute).
 
 
 43
 The First Amendment is not violated when the government is required to examine the tenets and structures of religious organizations to determine whether its members are exempt from generally applicable regulations. See e.g. Wisconsin v. Yoder, 406 U.S. 205, 215-216, 92 S.Ct. 1526, 1533-1534, 32 L.Ed.2d 15 (1972) (exception to compulsory school attendance granted because of importance of traditional way of life to Amish faith); Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 696, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989) (ascertaining whether a payment to a religious institution is part of a quid pro quo transaction ineligible for tax exemption did not violate the First Amendment); U.S. v. C.E. Hobbs Foundation for Religious Training and Educ. Inc., 7 F.3d 169 (9th Cir.1993) (Internal Revenue Service was entitled to discover organization's records to determine whether it was a church and therefore entitled to tax-exemption). However, those determinations are entirely different from the claimed right of the government to deny statutory rights to an individual because he is perceived by the government not to be as devout a member of his church as the government believes that he should be.
 
 
 44
 Under special circumstances, the First Amendment seems to tolerate an inquiry into the sincerity or authenticity of an individual's professed religious beliefs. See U.S. v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (inquiry into the petitioners' belief in the facts they asserted as religious truths was appropriate in a trial for mail fraud); Witmer v. U.S., 348 U.S. 375, 381, 75 S.Ct. 392, 395-396, 99 L.Ed. 428 (1955) (sincerity of a registrant in objecting, on religious grounds, to participation in war was necessary factor in determining conscientious objector status).[1] Although these cases superficially appear to authorize government scrutiny of the strength of religious convictions, the cases themselves do not make such an inquiry.
 
 
 45
 The Court's inquiry in Witmer, for example, was not whether or not Witmer was a devout Jehovah's Witness, but whether or not his opposition to participating in war was grounded in his religious convictions or in other reasons. The various applications submitted by the petitioner to his draft board demonstrated that his opposition to war was not based upon a religious belief. Witmer, 348 U.S. at 382-383, 75 S.Ct. at 396-397.
 
 
 46
 Similarly, the Ballard case stands simply for the proposition that fraud is fraud, no matter what its subject matter, and did not attempt to make a religious determination of the defendants' membership in a church. The instructions given to the jury by the district court in Ballard specified:
 
 
 47
 You are not to be concerned with the religious belief of the defendants, or any of them. The jury will be called upon to pass on the question of whether or not the defendants honestly and in good faith believed the representations [they made].... Ballard, 322 U.S. at 82, 64 S.Ct. at 884.
 
 
 48
 Thus, the jury in Ballard was not asked to pass on the content of the defendants' religious beliefs, but only to determine whether or not the defendants cheated their victims out of their money and property by falsely promising to cure incurable diseases. Id. at 80, 64 S.Ct. at 883.
 
 
 49
 Even to the extent that these cases appear to permit some religious inquiry by the government, they do not permit the judgment made by the IJ in this case.
 
 
 50
 First, Mejia-Paiz's statutory rights in this immigration case did not depend on the strength of his religious convictions. The issue before the IJ was whether or not Mejia-Paiz had a well-founded fear of persecution on the basis of religious or political persecution. Just as imputed political opinion can form the basis of political persecution, Hernandez-Ortiz v. INS, 777 F.2d 509, 517 (9th Cir.1985), a less than extremely devout church member may qualify for asylum or withholding of deportation due to persecution on the basis of religious affiliation. Therefore, although factors such as whether the Sandinistas knew that Mejia-Paiz considered himself to be a Jehovah's Witness and whether their harassment of him was motivated by hostility toward Jehovah's Witnesses are crucial to the determination of his petition, the sincerity of his religious beliefs is irrelevant.
 
 
 51
 Second, the IJ did not inquire into Mejia-Paiz's beliefs, but rather made a judgment, based on the IJ's personal perception of the customs of Jehovah's Witnesses and Mejia-Paiz's perceived non-compliance with one of those customs, that Mejia-Paiz was not a member of that church. On the basis of his interpretation of religious practices and judgment of what constitutes religious membership, the IJ decided that Mejia-Paiz was lying about being a Jehovah's Witness, and therefore was not credible. However, the IJ's initial judgment that Mejia-Paiz was not a Jehovah's Witness constituted an impermissible venture by the IJ into the question of church membership--a question that must be reserved for the Jehovah's Witness church. Serbian Eastern Orthodox Diocese, 426 U.S. at 714, 96 S.Ct. at 2382-2383 (civil courts exercise no jurisdiction over the conformity of the members of the church to the standard of morals required of them) (quoting Watson, 80 U.S. (13 Wall.) at 733-734).
 
 
 52
 A judge violates the First Amendment when he bases his decision not on objective facts but on his personal conclusions as a "lay theologian." Whether a person is a devout member of his church is not for the government to decide. It involves religious stereotyping that clouds all rational thinking. The majority in this case has declared that a judge may take judicial notice of religious dogma and customs and decide whether or not an individual is a member of a church on the basis of nonconformity to such dogma or customs. That simply is wrong. That has never been the law, except in ecclesiastical courts.
 
 
 53
 Under the Federal Rules of Evidence, judicial notice is appropriate only where the fact noticed is not subject to reasonable dispute. Fed.R.Evid. 201(b); Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir.1992). In particular, a trial judge is prohibited from relying on his or her personal experience to support the taking of judicial notice. U.S. v. Lewis, 833 F.2d 1380, 1385 (9th Cir.1987). Ironically, this court has previously taken judicial notice of the fact that "often the keenest disputes and the most lively intolerance exists among persons of the same general religious belief, who, however, are in disagreement as to what that faith requires in particular matters." Ward v. Walsh, 1 F.3d 873, 878 (9th Cir.1993). Because the essential practices of any religion are anything but "undisputed," and because the IJ's notice was based solely on his own personal experience, it was improper for him to take judicial notice of the rule that Jehovah's Witnesses do not swear under oath and then to use this fact to dismiss all of Mejia-Paiz's testimony.
 
 
 54
 "The 'establishment of religion' clause of the First Amendment means this: ... No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." Torcaso v. Watkins, 367 U.S. 488, 493, 81 S.Ct. 1680, 1682, 6 L.Ed.2d 982 (1961) (quoting Everson v. Board of Education, 330 U.S. 1, 15-16, 67 S.Ct. 504, 511-512, 91 L.Ed. 711 (1947)). It also means that a government official may not withhold statutory rights because the petitioner has not conformed to that official's interpretation of religious dogma.
 
 
 55
 I therefore dissent.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 [1]
 This does not mean that corroborative evidence is necessarily required in all cases. We have recognized that an authentic refugee is often limited in his ability to offer direct corroboration of specific incidents of persecution. Turcios v. INS, 821 F.2d 1396, 1402 (9th Cir.1987). For example, where the particularized evidentiary burden is too great, we do not require that an alien produce independent evidence of a specific threat to his life. Gomez-Saballos v. INS, 79 F.3d 912, 916 (9th Cir.1996). "Therefore, an alien's unrefuted and credible testimony may be sufficient." Turcios, 821 F.2d at 1402
 
 
 [2]
 The affidavit stated only that Mauricio Mejia-Paiz knew that his brother was an active member of the Jehovah's Witnesses
 
 
 [1]
 Even in the conscientious objector cases, which involve the national security of the United States, the Supreme Court has wisely stayed away from questioning religious dogma and based its determinations of conscientious objector status on other grounds. See, e.g. U.S. v. Seeger, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965) ("[P]utting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty.") (quoting U.S. v. Macintosh, 283 U.S. 605, 634, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931))