F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

YONG TING YAN,

        Petitioner,

v.

ALBERTO R. GONZALES,
Attorney General,

        Respondent.

No. 05-9564

---

**APPEAL FROM THE BOARD OF IMMIGRATION APPEALS**
**PETITION FOR REVIEW**
**(No. A96-061-036)**

---

Submitted on the briefs:

Yong Ting Yan, Pro Se, Petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division, Greg D. Mack, Senior Litigation Counsel, Office of Immigration Litigation, Thomas M. Gannon, Attorney, Appellate Section, Criminal Division, Department of Justice, Washington, D.C., for Respondent.

---

Before **McCONNELL**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Pro se petitioner Yong Ting Yan seeks review of a final order of removal issued by the Bureau of Immigration Appeals (BIA), which summarily affirmed a determination by an Immigration Judge (IJ) denying Mr. Yan's application for asylum, restriction on removal,[1] and the Convention Against Torture (CAT). We reverse the decision of the BIA, and remand for further proceedings.[2]

Mr. Yan is a citizen and native of China who is subject to removal from this country but who seeks asylum, claiming that he was persecuted by government authorities in China for being a Christian. The IJ gave two basic reasons for disbelieving Mr. Yan's testimony concerning this persecution. First, the IJ stated that he had "concerns about [Mr. Yan's] commitment to Christianity" sufficient to give him "serious doubts about [Mr. Yan's] credibility." Admin. R. at 41. Second, the IJ stated that Mr. Yan had not shown "that it is likely that he would be or would have been targeted by the authorities in China on account of his religious activity." *Id.* at 43. As neither of these reasons was supported by

---

[1] Prior to the amendments to the Immigration and Nationality Act made by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), "restriction on removal" was known as "withholding of removal." *Wiransane v. Ashcroft*, 366 F.3d 889, 892 n.1 (10th Cir. 2004). Although the BIA referred in its decision to "withholding of removal," since this claim was filed after IIRIRA's effective date, we will use the term "restriction on removal" here.

[2] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

substantial evidence, we reverse the BIA's order affirming the IJ's decision, and remand for further consideration.

## LEGAL STANDARD

To be eligible for asylum, an alien must first show that he is a "refugee." *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004). To establish refugee status, the applicant must demonstrate that he has suffered past persecution or has "a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Wiransane*, 366 F.3d at 893 (quotation omitted).

To qualify for restriction on removal, an alien must show a "clear probability" of persecution in the proposed country of removal. *Niang v. Gonzales*, 422 F.3d 1187, 1195 (10th Cir. 2005). The Convention Against Torture prohibits the return of an alien to a country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 1208.16(c)(2). "The alien must show, however, that the persecution would be so severe that it would rise to the level of torture." *Niang*, 422 F.3d at 1196.

STANDARD OF REVIEW

"Since the BIA summarily affirmed the IJ's decision, we review the IJ's analysis as if it were the BIA's." *Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1045 (10th Cir. 2004). "We review the [IJ]'s legal determinations de novo, and [his] findings of fact under a substantial-evidence standard." *Niang*, 422 F.3d at 1196. The agency's findings of fact are conclusive unless the record demonstrates that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).[3]

ANALYSIS

**1. Is Mr. Yan *Really* a Christian?**

As noted, the IJ stated that he had "concerns about [Mr. Yan's] commitment to Christianity." Admin. R. at 41. Among other things, Mr. Yan "seemed to have only rudimentary knowledge of [the] Christian religion." *Id.* at 40. As will be seen, however, the record does not support this finding.

---

[3]     The REAL ID Act of 2005 includes new provisions relating to agency credibility determinations, now codified at 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C), and 1231(b)(3)(C). These provisions, however, only apply to aliens who applied for asylum or other relief after May 11, 2005, the effective date of the Act. *See* Pub. L. No. 109-13, div. B § 101(h)(2), 119 Stat. 231, 305. Mr. Yan applied for asylum, restriction on removal, and CAT relief in 2002. Hence, the new provisions do not apply to his claims.

On cross-examination in this case, counsel for the DHS administered a sort of mini-catechism to Mr. Yan. To the extent Mr. Yan was unable to answer the questions posed to him, some of which were phrased as "trick" questions, the IJ concluded that Mr. Yan was not really a Christian. To the extent he was able to answer the questions, the IJ concluded that Mr. Yan had been coached. The IJ placed very little weight on what would seem to be the most salient factor in determining the sincerity of Mr. Yan's beliefs: his highly personal and emotional testimony about his conversion to faith in Jesus Christ and his participation in Christian activities in China.

Mr. Yan testified that at the time he became a Christian, he was in the hospital after injuring his back on the job. Mr. Yan was very depressed as a result of his injuries. He stated that a co-worker named Shu Wei Gong came to visit and to talk with him about Christianity. The co-worker told Mr. Yan not to be depressed because "there's still good people around in this world." *Id.* at 73. Mr. Gong told him:

> in this world, there's a loving God and he send his beloved son to come to this world to be our Savior. He sent his beloved son in order to save us. He was nailed to a cross. He said who in this world will give their only beloved son to come and to save the world [from] sin. When I heard all this message, I was very touched.

*Id.* at 74.

After he was released from the hospital, Mr. Yan began attending meetings with other Chinese Christians. The first meeting was at the house of Mi You Min. There were four people present. They had a Sunday worship service where they read the Bible together and sang hymns. They also ate a meal together. Mr. Yan stated that these people were "very friendly and they are different from people who are outside so I decide to stay." *Id.* at 75.

Mr. Yan began attending weekly meetings with his newfound Christian friends. He supplied an intriguing detail about the members of this "house church." They would not come to his house, he said, because he had not yet been baptized. Mr. Yan remedied this defect on Christmas Day, December 25, 1998. He described his baptism as follows:

> Shu Wei Gong told me that today, we have a Pastor Li coming here to do a baptismal service on you and everybody clapped their hand and was very happy. And, after that, we all read our Bible and we all pray together. And then, after we sing the songs and Pastor Li said I will hold a baptismal service for Mr. Yan You Ting.
>
> [. . .]
>
> And I was standing there and the Pastor Li put his hand on my head. He said in the name of the Father, the Son, and the Holy Spirit, I baptize you, Mr. Yan You Ting that you will belong under the name of Christ. All of your sins are forgiven and your soul, your spirit will always go to heaven and then he take some water from the bowl and sprinkle it on my head and then I say, amen and everybody say amen.

*Id.* at 77.

When asked how the ceremony had made him feel, Mr. Yan stated, "I [felt] that I have gone through a rebirth experience that was I – that what I was belonged to my past.  Now, I'm a new person."  *Id.* at 78.  He stated further that

> All my emotion, my whole being, my mental state that I have somebody to rely on.  I have.  Before, I didn't know that in this world, there's such a loving God that will have his son to die for me.  I think he is a great God.  I will attend all of the meetings.  I will grow.

*Id.*

Mr. Yan was asked to sing a Christian hymn, and he did.  The translation was "Jesus loves you.  Jesus loves you in your life.  The greatest blessing is Jesus love you."  *Id.* at 113.

Notwithstanding these displays of evangelical piety, the agency attempted on cross-examination to trip Mr. Yan up on his knowledge of the Bible and Christian doctrine.  The IJ's conclusion, that Mr. Yan knew very little about Christian doctrine, seems surprising in light of the actual testimony presented.  As noted, Mr. Yan had already demonstrated in his testimony under questioning by his own attorney a very personalized notion of the doctrine of the Atonement and the concept of rebirth.  His subsequent testimony under cross-examination showed that he also knew a thing or two about the Bible:

> Q.  When you did your Bible study, which part did you study more, the Old or the New Testament?

> A.  Usually, the New Testament more.

Q. If I said, let's see, for they shall inherit the kingdom, what is the part that goes before that? It's in the Beatitudes?

A. Blessed are the meek for they shall be inheriting the kingdom of God. Blessed are those who are persecuted and those are the people that also inherit the kingdom of God.

Q. The meek inherit the earth. People who are persecuted in my name's sake are the ones who would be inheriting the kingdom.

[Interpreter] TO JUDGE

That is the interpreter's fault because meek and *shising*, they are two that are very close.

MR. YAN TO [DHS counsel]

A. Meek is the one that inherit the earth.

[Interpreter] TO JUDGE

It is the interpreter's fault, Your Honor.

[DHS counsel] TO MR. YAN

Q. Okay. Let me try something else. Where would you find the Book of Nefi [sic]?

A. Never heard of this book Nefi [sic].

Q. Where would you find the collection called the doctrines and covenants?

A. It is in the Old Testament in the Book of the Law.

Q. Which one's the Book of the Law?

A. The Book of Moses. The five Book of Moses.

Q. Which one of the five Books of Moses?

A. It is the Book of Genesis, the Book of Exodus, the Books of Leviticus, the Book of Deuteronomy, and the Book of the Law.

Q. Which one of those books is considered the Book of Laws? There's one that's considered the Book of Laws?

A. It's the Genesis and the Book of the Law.

[DHS counsel] TO JUDGE

For the record, the Book of Law is Deuteronomy. And also, for the record, Nefi [sic] is in the book of Mormon and doctrine and covenants is not in the Bible. It's a separate text in the Mormon church.

MR. YAN TO [DHS counsel]

A. I'm sorry, it should be Deuteronomy. It should not be the Genesis. My memory is failing bad on me.

[DHS counsel] TO MR. YAN

Q. What are the psalms? What type of writing is the Psalms?

A. Psalms is David's song of praise to God.

Q. That's correct.

A. My memory is not very good.

[. . .]

Q. Were you confirmed into the family church?

A. Yes.

Q. How were you confirmed?

A. What do you mean by confirmed?

Q. Well, you just answered yes. What did you understand it to mean?

A. How do you get – what you mean by confirm?

Q. You just answered yes to when I asked you.

A. Yeah. I don't understand what is getting confirmed into the church. I'm sorry because I really don't understand your question in the first place. Could you explain again the meaning to be confirmed?

*Id.* at 102-05.

Several observations may be made about this exchange. First, Mr. Yan's responses to the Bible questions were fairly accurate. He was able to complete the Beatitudes question, notwithstanding an error by the interpreter. He knew four of the first five books of the Bible, and referred to the first five books of Moses as the "Book of the Law," consistent with Jewish practice, which calls these five books as the Torah, or "law."[4] He had, unsurprisingly, never heard of the book of Nephi, which is found in the Book of Mormon and not the Bible. He knew what the Psalms are. While he became confused about confirmation, that may be understandable if his particular group was Protestant and non-sacramental. Confirmation is a rite practiced primarily in Western

---

[4] As the government's counsel pointed out, the book of Deuteronomy (meaning "second law") may also be referred to as the "Book of the Law"; Mr. Yan acknowledged this.

Christianity among Catholic, Anglican and Lutheran churches.[5]  Only Catholics, among Western denominations, continue to regard confirmation as a binding sacrament of the Church.  It should also be noted that Mr. Yan only has a high school education, is the only Christian in his family, and at the time of the hearing had only been a Christian for five years.

Later, there followed an exchange that the IJ found particularly significant:

Q.  Did you celebrate Easter this year?

A.  Yes.

Q.  How did you do that?

A.  I celebrated Easter all by myself at home by myself.

Q.  What did you do?

A.  I make own Holy Communion and I pray.

Q.  Do you know when Easter is?

A.  Easter is April – April something.  Christmas is December the 25th.  Easter is – let me think.  I cannot really remember.  My memory's getting bad.

Q.  Do you know what Easter celebrates?

[ . . . ]

A.  I cannot remember.  I remember Christmas is the time that we celebrate Jesus coming.

_____

[5]      *See* "Confirmation" in The Catholic Encyclopedia (online version), http://www.newadvent.org/cathen/04215b.htm (visited Dec. 29, 2005).

Q.  You don't know what Easter [is]?

A.  It's the resurrection of Jesus.

Q.  Why didn't you remember that before?

A.  Cause – because see my mind reacts very slow.  Sometimes, I just got lapses.  Because I have had brain injuries twice already.

*Id.* at 111-12.

Mr. Yan's inability to remember the exact day of Easter is unsurprising. The exact date differs from year to year, and actually requires a set of extraordinarily complex calculations.  As the U.S. Naval observatory explains, Easter can occur at various times each year, between March 22 and April 25.  http://aa.usno.navy.mil/faq/docs/easter.html (visited Dec. 29, 2005).

Christmas, of course, occurs dependably each year on December 25th. Mr. Yan knew that.  While it is true that it took Mr. Yan a moment or two to remember that Easter concerns "resurrection," this is a slender reed indeed on which to make an adverse credibility finding, particularly given the fact that the word "Easter" is itself an English word referring to a festival of pagan origin[6] and appears nowhere in the foundational document of Christianity, the Bible.

---

[6]     "Easter or Eastre as it is originally, was the name of a pagan goddess of Spring whose festival was held on the vernal equinox." http://www.wordorigins.org/wordore.htm (visited Feb. 9, 2006).

We are troubled that while the IJ relied heavily on Mr. Yan's responses to the mini-catechism administered at the hearing, stressing his formal, doctrinal knowledge of Christianity, he barely addressed, and gave no good reason for rejecting, Mr. Yan's testimony about his personal experiences with Christianity. We agree with the Eighth Circuit that a detailed knowledge of Christian doctrine may be irrelevant to the sincerity of an applicant's belief; a recent convert may well lack detailed knowledge of religious custom. *Ahmadshah v. Ashcroft*, 396 F.3d 917, 920 n.2 (8th Cir. 2005). *Cf. also Mejia-Paiz v. INS*, 111 F.3d 720, 725-29 (9th Cir. 1997) (Ferguson, J., dissenting) (stating that where alien's testimony that he belongs to a church is uncontroverted, court's opining on sincerity of alien's religious belief, based on his failure to adhere to particular religious customs, violates First Amendment). Or, as Mr. Yan's counsel before the BIA put it, Mr. Yan is "a believer and adherent of Christianity and not a seminary student." Admin. R. at 8.

The IJ also relied on alleged inconsistencies in Mr. Yan's record of church attendance in the United States. The IJ noted that Mr. Yan testified on direct examination that he attends church every week or every other week. Actually, what Mr. Yan said, in response to a question about how often he attends church *in the United States* (not specifically in Denver) was "Sometimes every week. Sometimes, every two weeks." *Id.* at 93. The IJ found this inconsistent with

Mr. Yan's statement that he had attended church only twice since moving to Denver from Los Angeles, about five months before the hearing. Yet Mr. Yan did provide an explanation for his lack of regular attendance *in Denver*:

Q. What church do you attend?

A. In Los Angeles, I attended two Chinese church. One is called Chinese Alliance Church. The other one is called the Glory Church but in here [Denver], I cannot find any Chinese church so I attended American church. Only been there twice.

*Id.* at 108.

Mr. Yan further testified that all the services in the Denver church were in English, and he really couldn't understand anything. Mr. Yan also presented testimony from a witness, Mr. Chen, who knew Mr. Yan in Los Angeles, where he lived for two months immediately after arriving in the United States. Mr. Chen stated that he had seen Mr. Yan at Glory Church in El Hombre, California, three or four times, and had spoken to him there. Mr. Chen stated that Mr. Yan had asked him to testify at the IJ hearing to prove that he had attended the Glory Church, and that he had come to the hearing to do so, out of a sense of Christian duty. The IJ found Mr. Chen's testimony "relatively credible." *Id.* at 38.

The only reasonable conclusion to be drawn from this record was that Mr. Yan did attend Christian services in this country, beginning soon after his arrival here. Notwithstanding his stumbling over a few points of Christian doctrine, he presented a coherent, personal testimony of his conversion to faith in

-14-

Jesus Christ in China and continued adherence to those beliefs since he arrived in the United States. The IJ's decision provides no valid reason for discounting Mr. Yan's claim to be a Christian.

### 2. Did the Authorities Really Persecute Mr. Yan?

Mr. Yan testified that the authorities broke up his home church, confiscated his Bible, and threw him in jail, where he was beaten. Relying on the background material provided from the State Department, the IJ found that a "small and unobtrusive" house church like Mr. Yan's (which contained only six or seven members) would have been tolerated by authorities, if they knew about it at all. Admin. R. at 42. This conclusion finds at least some support in a State Department Country Religious Freedom Report in the record. *Id.* at 150 (stating smaller house churches made up of family and friends "were tolerated by the authorities as long as they remained small and unobtrusive"). What is troubling about this line of reasoning is that the IJ appears to have made an assumption that just because the authorities do not *ordinarily* attack home churches, they would not have done so in Mr. Yan's case.[7]

_____

[7] Mr. Yan did supply some documentary evidence to support his claim. The IJ found this evidence "of limited evidentiary value," Admin. R. at 38, primarily because Mr. Yan had not complied with the authentication procedures described in 8 C.F.R. § 287.6. Since these procedures generally require attestation of documents by the very government the alien is seeking to escape, courts generally do not view the alien's failure to obtain authentication as requiring the *rejection*

(continued...)

The IJ did not supply any other reason for disbelieving the particular facts that Mr. Yan related about the episode of persecution he endured in China. He mentioned only one specific inconsistency, in whether Mr. Yan actually signed any documents under interrogation. *Id.* at 39. His conclusion that "the respondent would appear to be the most recent new member of a very small group which this Court finds was very unlikely to have come to the attention of the authorities in China," *id.* at 43, is notably inconsistent with his earlier conclusion that Mr. Yan was not even a Christian. In sum, the IJ gave no reason, other than the minor inconsistency previously noted, to discount the particular facts Mr. Yan related concerning the persecution he endured as a Christian from the Communist government of China.

### 3. Conclusion

The reasons the IJ gave for rejecting Mr. Yan's asylum, restriction on removal, and Convention Against Torture claims are not supported by substantial evidence in the record. We must therefore reverse and remand for further proceedings in this case.

---

[7](...continued)
of a document. *Cao He Lin v. United States Dep't of Justice*, 428 F.3d 391, 404 (2d Cir. 2005). Here, however, the IJ did not reject the documents; he merely found their evidentiary value to be limited.

The BIA's final order of removal is REVERSED and this case is REMANDED for further proceedings.